# Exhibit "A"

Troy B. Froderman (012717)
Scott C. Ryan (026791)
FR LAW GROUP PLLC
4745 North 7th Street, Suite 310
Phoenix, AZ 85014
602.566.7425
tfroderman@frlawgroup.com
sryan@frlawgroup.com
*Attorneys for Plaintiff*
*International Society for the*
*Protection of Mustangs and*
*Burros*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| International Society for the Protection of Mustangs and Burros, a non-profit organization,<br><br>       Plaintiff,<br><br>vs.<br><br>United States Government, Department of Agriculture, Tom Vilsack as acting United States Secretary of Agriculture; United States Forest Service, Judy Palmer as acting U.S. Forest Supervisor,<br><br>       Defendants. | Case No. 3:22-cv-08114-SPL<br><br>**VERIFIED FIRST AMENDED COMPLAINT SEEKING A TEMPORARY RESTRAINING ORDER, DECLARATORY AND INJUNCTIVE RELIEF, and WRIT of MANDAMUS**<br><br>(Jury Trial Demanded)<br><br>**(HON. STEVEN P. LOGAN)** |

Plaintiff, the International Society for the Protection of Mustangs and Burros ("ISPMB"), a non-profit organization, hereby alleges as follows:

## NATURE OF THE ACTION

1. This is an action for declaratory and injunctive relief precipitated by the March 21, 2022 notice that the United States Forest Service planned the capturing and removal of "up to 20 unauthorized livestock", specifically, feral horses found on the Apache National Forest. In its notice, the Forest Service alleges that these horses are

1

negatively impacting native plants and animals, watersheds and ecosystems. Once captured, the horses will be impounded and offered for public sale.  Upon information and belief, the majority of these horses will be purchased for slaughter and sold for their meat.

2.      On July 8, 2022, the United States Forest Service provided additional notice of the impending July 14th, 20th, and 21st public sale of "livestock impounded from National Forest System land" which upon information and belief indicates that the U.S. Forest Service has carried out the capture of wild free-roaming horses from the Apache National Forest.

## JURISDICTION AND VENUE

3.      Jurisdiction is proper in this action pursuant to 28 U.S.C. Section 1331 (federal question), 28 U.S.C. Section 1361 (mandamus), 28 U.S.C. Section 2201 (declaratory judgment), 28 U.S.C. Section 2202 (injunctive relief), the Administrative Procedure Act (5 U.S.C. Section 701, et seq.) ("APA"), the National Environmental Policy Act (42 U.S.C. Section 4321, et seq.) ("NEPA"), and 28 U.S.C. 1346 (United States as defendant).

4.      Venue is appropriate in this Court pursuant to 28 U.S.C. Sections 1391(b) and (e).

## THE PARTIES

5.      Plaintiff, the International Society for the Protection of Mustangs and Burros ("ISPMB"), is a non-profit organization formed for the purpose of furthering the protection and preservation of wild horses and burros.  ISPMB is incorporated in the state of California. ISPMB was headquartered in Arizona from approximately 1993 until the year 2000 when it

re-located its headquarters to South Dakota.  ISPMB is the oldest wild horse and burro organization in the United States.  Along with its first president, Wild Horse Annie, ISPMB was instrumental in securing and implementing the 1971 Wild Free-Roaming Horses and Burros Act.  ISPMB is an affected and interested party in the State of Arizona.

6.     Defendant, the U.S. Department of Agriculture, is a branch of the United States government which has been charged with the responsibility of overseeing the protection and management of wild free-roaming horses on National Forest System lands.

7.     Defendant, Tom Vilsack, is named only in his capacity as the current Secretary of Agriculture, United States Government.

8.     Defendant, U.S. Forest Service, is a governmental agency of the United States and is under the direction and control of the Secretary of Agriculture.

9.     Defendant, Judy Palmer, is named only in her capacity as the acting U.S. Forest Supervisor for the Apache-Sitgreaves Forests.  Her business office is located in Springerville, Arizona.

## GENERAL ALLEGATIONS

10.     In passing the Wild Free-Roaming Horses and Burros Act of 1971, Congress declared that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene.  It is the policy of Congress that wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death; and to

3

accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands."  16 U.S.C. § 1331 et seq.

11.    Sometime prior to March 21, 2022, the U.S. Forest Service arbitrarily and without adequate investigation, determined that up to 20 horses living on the Apache National Forest were "unauthorized livestock" or feral horses and that their removal was necessary.

12.    On or about March 21, 2022 the U.S. Forest Service released a notice memorializing their plan to remove the horses, a copy of which is attached as Exhibit "A" and incorporated herein.

13.    An updated notice by the U.S. Forest Service, relative to this horse removal, changed the number of horses to be removed from "20" to "a number of unauthorized livestock", a copy of which is attached as Exhibit "B" and incorporated herein.

14.    In addition to not disclosing how many horses they intend or have authorized to remove, the U.S. Forest Service notice regarding this removal does not identify where, within the Apache National Forest, these horses are located and living.

15.    On July 8, 2022 the United States Forest Service provided an update, giving notice of the impending July 14th, 20th, and 21st public sale of "livestock impounded from National Forest System land" which upon information and belief indicates that the U.S. Forest Service has already carried out the capture of wild free-roaming horses from the Apache National Forest, a copy of which is attached as Exhibit "F" and incorporated herein.

16.    In her memo implementing what she refers to as the "Unauthorized Livestock Project", Forest Supervisor Judy Palmer authorizes generally, the removal of unauthorized livestock from the Apache National Forest.

4

17.     The Apache National Forest consists of three Ranger Districts: Springerville, Alpine, and Clifton.

18.     In a June 11, 2021 Forest Service "Determination Letter" presumably created or utilized to bolster the "unauthorized livestock" designation, Forest Supervisor Anthony Madrid makes conclusions about the origins of horses found within the Black River Watershed in the Alpine and Springerville Ranger Districts.  A copy of this Letter is attached as Exhibit "C" and incorporated herein.

19.     Similarly, a problematic June 2021 Assessment of the "legal status of the Apache Horses" by Forest Range Program Manager Ralph Fink, purported to establish the origins of horses found in the Black River region of the Apache National Forest, specifically within the Alpine and Springerville Ranger Districts.  A copy of the Assessment is attached as Exhibit "D" and incorporated herein.

20.     While one could assume that the scope of this capture and removal, based on the Determination Letter and the Assessment, is to remove horses from the Black River region of the Apache National Forest within the Alpine and Springerville Ranger Districts, it is absolutely not clear from the U.S. Forest Service's notice nor from Ms. Palmer's Project memo which appear to provide for the removal of horses from the entire Apache National Forest.

21.    Furthermore, the U.S. Forest Service has summarily concluded, without adequate investigation or documentation and in the face of contradictory evidence, that these horses are feral horses as opposed to protected wild free-roaming horses.[1]

22.    There is Documentation of wild horses existing in the Apache National Forest as early as 1910 and throughout the following decades that the Forest Service appears to have ignored.

23.    Upon information and belief, the U.S. Forest Service has failed historically and presently to meaningfully survey the Apache National Forest for the presence of wild free-roaming horses.

24.    Upon information and belief, the U.S. Forest Service has not made any attempt historically or presently, via census, inventory, or any other type of survey, to determine how many of the horses slated for removal are branded or unbranded.

25.    The U.S. Forest Service has made an uninformed determination that these horses that are to be removed (the exact number of which remains unidentified) are feral and not subject to the protections under the Wild Horses and Burros Act of 1971.

26.    The U.S. Forest Service has also failed to complete an environmental impact statement ("EIS"), as contemplated by the National Environmental Policy Act ("NEPA"), which would have provided an analysis of the environmental impact this horse removal would have.

---

[1] Wild free-roaming horses are all "unbranded and unclaimed horses...and their progeny that have used lands of the National forest System on or after December 15, 1971, or do hereafter use these lands as all or part of their habitat, but does not include any horse...introduced onto the National Forest System on or after December 15, 1971, by accident, negligence, or willful disregard of private ownership."  36 C.F.R. § 222.60(b)(13).

27.     The U.S. Forest Service is tasked with *protecting*, managing, and controlling the wild free-roaming horses on the lands of the National Forest System yet, upon information and belief, they have neglected, for decades, to properly account for or manage those horses living on the Apache National Forest.

28.     Without adequate investigation, survey, census and analysis, this federal action has risked the lives of these beloved historical symbols of the West, ironically, by the very agency tasked with their protection.

29.     The captured horses are in imminent risk of being unlawfully sold, potentially for slaughter.

30.     Absent the prayed for declaratory and injunctive relief, ISPMB and its members will suffer irreparable harm.

## COUNT ONE
### (Violation of NEPA)

31.     Plaintiff incorporates herein by reference the preceding paragraphs numbered 1 through 30.

32.     The National Environmental Policy Act, or "NEPA", establishes a national policy for the environment through which it seeks to promote, among other things, the preservation of "important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity, and variety of individual choice".  42 U.S.C. § 4331(b)(4).

33.     NEPA provides certain protections for the environment including the requirement that the "responsible agency official" submit a statement detailing the

environmental impact a major federal action will have *prior* to that action taking place. 42 U.S.C. § 4321, et seq.

34.    Specific relevant NEPA requirements include the following:

(2)    [A]ll agencies of the Federal Government shall-***

**(C)**    include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

**(i)**    the environmental impact of the proposed action,

**(ii)**    any adverse environmental effects which cannot be avoided should the proposal be implemented,

**(iii)**    alternatives to the proposed action,

**(iv)**    the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

**(v)**    any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

35.    The purpose of requiring an environmental impact statement ("EIS") "is to ensure agencies consider the environmental impacts of their actions in decision making. It shall provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize

8

adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise clear and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is a document that informs Federal Agency decision making and the public." 40 C.F.R. 1502.1.

36.    A fundamental part of this protection is the opportunity for public comment, whereby the federal agency "affirmatively solicit[s] comments [from the public] in a manner designed to inform those persons or organizations who may be interested in or affected by the proposed action.

37.    The Code of Federal Regulations ("CFR"), Section 1508 defines what constitutes a Major Federal action, providing that it "means an activity or decision subject to Federal control and responsibility…" and "may include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies…". 40 C.F.R. 1508(q)(2).

38.    The Code of Federal Regulations ("CFR"), Section 1508 provides examples of categories of actions that constitute Major Federal actions, which include, in part, the following:

> (3)    (ii)    Adoption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based.
>
> (iii)    Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

        (iv)    Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as Federal and federally assisted activities.

39.    The U.S. Forest Service failed to prepare or issue an Environmental Impact Statement.

40.    The U.S. Forest Service justifies failing to complete an Environmental Impact Statement by relying on a categorical exclusion which they claim exempts them from the EIS requirement.

41.    A categorical exclusion as defined in the Code of Federal Regulations, "means a category of actions that the agency has determined, in its agency NEPA procedures, normally do not have a significant effect on the human environment. 40 C.F.R. § 1508.1(d). Effect is defined in pertinent part as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable…[e]ffects include ecological…aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effects will be beneficial." 40 C.F.R. § 1508.1(g), (g)(4). Finally, "human environment" is defined as "comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment." 40 C.F.R. § 1508.1(m).

42.    Forest Supervisor Judy Palmer documents, in a December 15, 2021 memo, the U.S. Forest Service's reliance on the categorical exclusion found at 7 C.F.R. § 1b.3(5) which provides that "[c]ivil and criminal law enforcement and investigative activities" are

10

determined not to have a "significant individual or cumulative effect on the human environment." A copy of the Memo is attached as Exhibit "E" and incorporated herein.

43.     The actions of capturing, permanently removing, and selling horses living on the Apache National Forest constitute far more than just a civil or criminal investigative activity. Those actions, in fact, clearly fit the definition of a Major Federal Action which necessitates compliance with NEPA provisions, including the requirement that an EIS be prepared.

44.     The ordered horse removal also fails to fall within the definition of what constitutes a categorical exclusion. Reliance on this categorical exclusion is nothing but an attempt to remove the horses without engaging in the due diligence required under the law – in other words, a quick fix.

45.     Actions to remove the horses from the Apache National Forest could have a significant effect on the surrounding environment and on the many people that study, view, and enjoy these horses.

46.     The Forest Service did not provide an analysis of any alternative options to removal.

47.     The Defendants have failed to comply with NEPA before ordering the removal of horses from the Apache National Forest.

48.     Under the Declaratory Judgment Act, 28 U.S.C. 2201, an actual controversy has arisen between Plaintiff and Defendants involving the interpretation of certain federal statutes and acts within this Court's jurisdiction.

49.     Absent declaratory and injunctive relief, ISPMB and its members will suffer immediate and irreparable harm.

## COUNT TWO
### (Violation of the Wild Free-Roaming Horses and Burros Act of 1971)

50.     The Plaintiff incorporates herein by reference the preceding paragraphs numbered 1 through 49.

51.     Under the Wild Free-Roaming Horses and Burros Act of 1971, the Secretary of Agriculture is "directed to protect and manage wild free-roaming horses as components of the public lands…". 16 U.S.C. § 1333(a).

52.     The term "wild free-roaming horses and burros" is specifically defined under the 1971 Act to mean "all unbranded and unclaimed horses and burros on public lands of the United States."  (Emphasis added). 16 U.S.C. Section 1332(a). (*See also* 36 C.F.R. § 222.20 (b)(13) defining Wild free-roaming horses as "…all unbranded and unclaimed horses and burros and their progeny that have used the lands of the National Forest System on or after December December 15, 1971, or do hereafter use these lands as all or part of their habitat, but does not include any horse or burro introduced onto the National Forest System on or after December 15, 1971, by accident, negligence, or willful disregard of private ownership.")

53.     The 1971 Act also states that the Secretary "shall manage wild free-roaming horses and burros in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands."  16 U.S.C. § 1333(a).  The Secretary "shall consider the recommendations of qualified scientists in the field of biology and ecology, some of whom shall be independent of both Federal and State agencies…" and the Secretary may

"designate and maintain specific ranges on public lands as sanctuaries for their protection and preservation..." 16 U.S.C. § 1333(a).

54.     The 1971 Act further provides that the Secretary "shall maintain a current inventory of wild free-roaming horses and burros on given areas of the public lands." 16 U.S.C. § 1333(b).

55.     Section 1338a of the 1971 Act provides that while the Secretary may use or contract for the use of motor vehicles for the purpose of transporting captured animals, such use can only be undertaken after a public hearing, among other things.

56.     The Defendants have made an uninformed and unilateral decision to remove an unidentified number of horses from the Apache National Forest, irresponsibly categorizing them as "unauthorized livestock" without performing their due diligence.

57.     The decision to capture and remove horses from the Apache National Forest was made without an inventory or accounting of the horses to determine their status as wild or domestic trespass, branded versus unbranded.

58.     Defendant's decision to remove the horses is unsupported by any meaningful investigation, evidence, or inventory. The U.S. Forest Service failed to support their conclusion that the horses they intend to capture and remove are not wild free-roaming horses or offspring of those horses.

59.     Upon information and belief, the U.S. Forest Service plans to use motor vehicles during the planned horse removal for the purpose of transporting the captured animals.

60.     Upon information and belief, no public hearing was held prior to the decision to capture and remove these horses.

61.     The U.S. Forest Service relies on the *Assessment of Horses on the Apache National Forest* to lend some support to its conclusion that the horses are "unauthorized livestock" however the Assessment is problematic and is premised on "[r]ecords [that] indicate there were no unclaimed horses on the Apache National Forest at the time the [Wild Horse and Burro Act] was passed." Exhibit "D". This assertion is made without citation and contradicts historical accounts that document the presence of horses well before the passage of the Act. Further, the U.S. Forest Service had not conducted any inventory or census prior to, at the time of, or for decades after the passage of the Act.

62.     The Defendants have failed to manage the horses in the Apache National Forest.

63.     The Defendants have failed to conduct an inventory or census the number, types, age, and condition of the horses in the Apache National Forest.

64.     The Defendants have failed to hold a public hearing for comment on the decision to use motor vehicles in the capture and transport of these horses.

65.     The Defendants have failed to make an effort to segregate any wild horses from domestic horses before ordering removal of all horses from the Apache National Forest.

66.     Under the Declaratory Judgment Act, 28 U.S.C. 2201, an actual controversy has arisen between Plaintiff and Defendants involving the interpretation of certain federal statutes and acts within this Court's jurisdiction.

14

67. Absent declaratory and injunctive relief, ISPMB and its members will suffer immediate and irreparable harm.

**COUNT THREE**
**(Violation of the Administrative Procedures Act)**

68. The Plaintiff incorporates herein by reference the preceding paragraphs numbered 1 through 67.

69. The Defendants have violated the Administrative Procedures Act by their actions and failures to act.

70. The Administrative Procedures Act allows for judicial review of certain federal agency actions. In particular, a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law…(D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A)(D).

71. The U.S. Forest Service's decision to remove an unidentified number of horses from the Apache National Forest without following NEPA requirements, without first conducting a full investigation or study in consultation with independent scientists, ecologists, and biologists, and without any inventory or census or management for decades is arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

72. Under the Declaratory Judgment Act, 28 U.S.C. 2201, an actual controversy has arisen between Plaintiff and Defendants involving the interpretation of certain federal statutes and acts within this Court's jurisdiction.

73. Absent declaratory and injunctive relief, ISPMB and its members will suffer immediate and irreparable harm.

15

## COUNT FOUR

### (Declaration that the Horses Are Wild Free-Roaming Horses entitled to Protection under the Wild Free-Roaming Horses and Burros Act of 1971)

74.     The Plaintiff incorporates herein by reference the preceding paragraphs numbered 1 through 73.

75.     Evidence exists indicating that, as far back as 1910, wild horses are and have been living in the Apache National Forest.

76.      The Wild Free-Roaming Horses and Burros Act of 1971 defines Wild Free-Roaming Horses as "all unbranded and unclaimed horses…on public lands of the United States." 16 U.S.C. § 1333(a).

77.     Those unbranded unclaimed horses on the Apache National Forest, including, the Springerville, Alpine, and Clifton Ranger Districts and those horses identified by the U.S. Forest Service as found in the Black River region of the Apache National Forest, specifically within the Alpine and Springerville Ranger Districts, satisfy the definition of Wild Free-roaming Horses and are entitled to those protections afforded under this act.

78.     Under the Declaratory Judgment Act, 28 U.S.C. 2201, an actual controversy has arisen between Plaintiff and Defendants involving the interpretation of certain federal statutes and acts within this Court's jurisdiction.

79.     Absent declaratory and injunctive relief, ISPMB and its members will suffer immediate and irreparable harm.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

16

A.      Plaintiff seeks a declaration that the Department of Agriculture and U.S. Forest Service, and their respective agents and acting representatives in office, have violated the provisions of NEPA and have an obligation to conduct an environmental assessment and/or impact study before ordering the removal of horses from the Apache National Forest.

B.      Plaintiff seeks a declaration that the Department of Agriculture and U.S. Forest Service, and their respective agents and acting representatives in office, have violated the provisions of the Wild Free-Roaming Horse and Burros Act of 1971 and that they have an obligation to comply with said provisions of the Act.

C.      Plaintiff seeks a declaration that the Department of Agriculture and U.S. Forest Service, and their respective agents and acting representatives in office, have violated the provisions of the Administrative Procedures Act, specifically, that their decision to remove horses from the Apache National Forest was made in an arbitrary and capricious fashion and that they have an obligation to comply with the provisions contained within the Act.

D.      Plaintiff seeks a declaration that the unbranded unclaimed horses that live on the Apache National Forest are Wild Free-Roaming horses entitled to the protections provided in the Wild Free-Roaming Horses and Burros Act of 1971.

E.      Plaintiff asks that this Court temporarily preliminarily restrain Defendants, their officers, agents, servants, employees, and those in active concert or participation with Defendants from:

      i.      Awarding a bid for the capture and removal of any horses from within the Apache National Forest;

17

      ii.    Rounding up and/or removing any horses from the Apache National Forests until Defendants have complied with the requirements of the Wild Horses and Burros Act of 1971, NEPA, and the APA, including, but not limited to:

        a)  Preparing an Environmental Impact Statement to determine the impact of the removal on the human and natural environment;

        b)  Determining the number of wild horses located in the Apache National Forest including means such as observation for branding or domestic markings, use of genetic testing and/or other means or study;

        c)  Providing the public with notice of any proposed action with regard to horses within the Apache National Forest and allowing for public comment on that proposed action and then take into consideration those comments prior to any future action.

      iii.   The selling of any horse, captured from the Apache National Forest and presently impounded pursuant to the Forest Service notices and actions identified and at issue in this Complaint, until these issues have been resolved to the satisfaction of this Court.

    F.     Pursuant to 28 U.S.C. § 1361, Plaintiff seeks a writ of mandamus compelling Defendants to comply with the requirements of the Wild Horse Act in protecting and managing horses within the Apache National Forest including:

18

i.    Conducting an inventory or accounting of the horses located within the Apache National Forest to determine their status as wild or domestic trespass, branded versus unbranded.

ii.    Presenting reliable data or investigative reports to support the assertion, if supportable, that horses in the Apache National Forest are "unauthorized livestock," as opposed to protected "wild free-roaming horses" or offspring of those horses;

iii.    Protecting any and all wild free-roaming horses in the Apache National Forests, including but not limited to foals born there and/or branded horses that have intermingled with the wild horses from capture, branding, harassment and death.

iv.    Conducting an inventory or census of the number, types, age, and condition of the wild free-roaming horses in the Apache National Forest and surrounding public lands.

v.    Conducting a scientific and independent study to determine the interaction with and relationship of the horses to other wildlife and foliage in the Apache National Forest.

G.    Plaintiff asks this Court to order the return of the impounded horses to the area where they were residing at the time of their capture.

H.    Absent the requested relief, Plaintiff will suffer immediate and irreparable injury.

1       I.      For an award of Plaintiff's reasonable costs, fees and expenses pursuant to 28

2 U.S.C. § 2412 *et seq.*

3       J.      For any other relief the Court or jury deems appropriate.

4

5 / / /

6 / / /

7

8

9                 **JURY TRIAL DEMAND**

10        Plaintiffs hereby demand a trial by jury.

11      DATED this 11th day of July 2022.

12                FR LAW GROUP PLLC

13

14

15                By:_____

16                  Troy B. Froderman, Esq.

17                  Scott C. Ryan, Esq.
                     4745 N 7th Street, Suite 310

18                  Phoenix, AZ 85014
                     *Attorneys for Plaintiff*

19

20 **FILED** this 11th day of July 2022, with

21 the Clerk of the United States District
  Court, District of Arizona

22

23 By:/s/ Sarah Frith

24

25

26

27

28

**VERIFICATION**

I, Karen Sussman, declare:

1.  I am a resident of Pennington County, State of South Dakota.

2.  I am over the age of 18 and am competent to make this Verification.

3.  I am the President of the International Society for the Protection of Mustangs and Burros.

4.  I am authorized to make this Verification on behalf of the International Society for the Protection of Mustangs and Burros.

5.  I have read the Verified First Amended Complaint and am familiar with its contents. With respect to the matters for which I have personal knowledge, I believe the contents of the Verified First Amended Complaint is true and correct.  With respect to matters outside of my personal knowledge, I believe the information contained in the Verified First Amended Complaint is true and correct.

6.  I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

EXECUTED on this ___*10*___ day of July, 2022.


By_Karen Sussman_

Karen Sussman
President, International Society for the
Protection of Mustangs and Burros

1

# Exhibit "A"

  An official website of the United States government  Here's how you know

**Forest Service**
Caring For the Land and Serving People

MENU

# USDA Forest Service to Conduct Necessary Removal of Unauthorized Livestock – Feral Horses

Release Date: Mar 21, 2022

**Springerville, AZ, March 21st, 2022** — The USDA Forest Service continues to plan for the necessary removal of up to 20 unauthorized livestock, commonly referred to as feral horses, on the Apache National Forest. This decision is a necessary step to ensure that the Apache National Forest is healthy and sustainable for years to come. These feral horses cause substantial problems for not only native plants and animals, which are being outcompeted for resources, but they also destroy watersheds and negatively impact ecosystems. They also pose an imminent threat to several federally listed and threatened species.

The Apache-Sitgreaves National Forests are working closely with a wide range of partners to safely address this problem before further unnecessary destruction is caused. These horses are feral and there are risks associated with gathering and removing these animals. The Forest Service and contractors will take every precaution possible to maintain the safety, health and well-being of all people and animals involved. These animals will be gathered using passive trapping techniques. Active gathering, which uses helicopters and physically moving animals, will not be used



Fire Danger TODAY

Alpine RD
MODERATE

Black Mesa RD
VERY HIGH

Clifton RD
HIGH

Lakeside RD
VERY HIGH

Springerville RD
VERY HIGH

Apache-Sitgreaves NF Fire Info

**Alerts & Warnings**

Stage II Fire Restrictions Lifted Friday, June 24

Fish Fire Area Closure

14-Day Stay Limit in 30-Day Period on Apache-Sitgreaves National Forests

View All Forest Alerts

at this time.

The Forest Service is committed to transparency during the entirety of this process. A sale notice will be published in the newspaper of record, posted at county court houses and post offices for 5-days, for people to claim owned animal(s). The Forest Service has been working with partners, ranchers, and animal rescues to find holding facilities where these horses can be sold in person or on-line in the next few weeks. The dates of the sale are to be determined and will be posted on our Forest website. We encourage individuals interested in buying these horses for personal use to attend future sales. If there are any questions or comments concerning this necessary action, please call 928-235-5764 or email SM.FS.ASNF_PAO@usda.gov.

Read Frequently Answered Questions

Return to top

| Recreation.gov | askUSDA | Report Fraud on USDA Contracts |
|---|---|---|
| Accessibility Statement | WhiteHouse.gov | Policies and Links |
| Visit OIG | Privacy Policy | eGov |
| Our Performance | Plain Writing | Non-Discrimination Statement |
| Anti-Harassment Policy | No FEAR Act Data | Open Government |
| Careers | FOIA | Information Quality |
| USA.gov | | |

**Apache Sitgreaves National Forests**

30 S. Chiricahua Dr.
Springerville, AZ 85938
928-333-6280

**Judy Palmer,** Forest Supervisor
**Ericka Luna,** Deputy Forest Supervisor

  

Contact Us

  **Forest Service**
U.S. Department of Agriculture

# Exhibit "B"

Apache-Sitgreaves National Forests - Land & Resources Management

  An official website of the United States government  Here's how you know

**Forest Service**
Caring For the Land and Serving People

MENU

# Unauthorized Livestock - Feral Horses Frequently Answered Questions

The Forest Service continues to plan for the necessary removal of a number of unauthorized livestock, commonly referred to as feral horses, on the Apache National Forest. This decision is a necessary step to ensure that the Apache National Forest is healthy and sustainable for years to come. These feral horses cause substantial problems for not only native plants and animals, which are being outcompeted for resources, but they also destroy watersheds and negatively impact ecosystems. They also pose an imminent threat to several federally listed and threatened species. These animals will be gathered using passive trapping techniques. Active gathering, which uses helicopters and physically moving animals, will not be used at this time.

In order to ensure that accurate information is shared, we have provided a list of commonly asked questions we have received from the public. This page will be updated as we receive more questions and we encourage you to refer to these answers as the trusted source of information. Information shared on non-official sites, non-Forest Service social media pages are not trusted sources of information and we highly encourage you and others to refer to this page. Any questions or comments on this topic can be sent to: Questions about Feral Horses

## News Releases



Fire Danger TODAY

Alpine RD
MODERATE

Black Mesa RD
VERY HIGH

Clifton RD
HIGH

Lakeside RD
VERY HIGH

Springerville RD
VERY HIGH

Apache-Sitgreaves NF Fire Info

**Alerts & Warnings**

Stage II Fire Restrictions Lifted Friday, June 24

Fish Fire Area Closure

14-Day Stay Limit in 30-Day Period on Apache-Sitgreaves National Forests

View All Forest Alerts

# Exhibit "C"



**Forest Service**     **Apache-Sitgreaves National Forests**     **30 South Chiricahua Drive**
Springerville, AZ 85938

---

**File Code:**  2200                                    **Date:**  June 11, 2021
**Route To:**

**Subject:**  Horse Management – Apache National Forest

**To:**  Michiko Martin, Southwestern Regional Forester

The management of the horses on the Apache-Sitgreaves National Forests has been a topic of discussion dating back several years.  Recently, concerns regarding the environmental impacts from the horses on the Apache National Forest within the Black River Watershed have been elevated to my attention internally as well as by the public. Environmental impacts of the horses include direct effects to habitats of federally listed species, challenges in managing critical watersheds, and competition for forage with wildlife and authorized livestock.  I tasked the Forest staff with assessing the origin of the Apache horses in an effort to determine how to appropriately manage these horses.  This letter documents my conclusion regarding the Apache horses located on the Alpine and Springerville Ranger Districts in the Black River area of the Apache National Forest.

Based on the information presented in the "Assessment of Horses on the Apache National Forest" (Fink 2021) as well as an "Unauthorized Livestock History" report prepared by Forest Service historians (Kline and Quarles 2021), forest records, my communications with individuals within and outside the Forest Service, and my overall knowledge and experience as Forest Supervisor on the Apache-Sitgreaves National Forests, my conclusion is that the unclaimed horses currently found on the Apache National Forest are "unauthorized livestock" in accordance with Forest Service regulations per 36 CFR 261.2.

These horses are not wild horses nor the progeny of wild horses and have not intermingled with wild horses as defined by 36 CFR 222.60 (b) (13). These horses originated from unauthorized livestock associated with past grazing permits and other private owners including the neighboring Fort Apache Indian Reservation. There were no unclaimed horses present at the establishment of the Wild Free-Roaming Horses and Burros Act of 1971. These horses became established in about the mid-2000s.  Heber Wild Horses did not migrate from the Heber Wild Horse Territory to the Apache National Forest. I have determined that management of the Apache horses should follow the guidance for unauthorized livestock outlined in the Forest Service directives and regulations.

*Anthony Madrid*
ANTHONY MADRID
Forest Supervisor



America's Working Forests – Caring Every Day in Every Way          Printed on Recycled Paper     

# Exhibit "D"

# Assessment of Horses on the Apache National Forest

Apache-Sitgreaves National Forests

Prepared by Ralph Fink, detailed Forest Range Program Manager

*June 2021*

## Introduction

The purpose of this assessment is to review available information and inform the Forest Supervisor in making a determination of the legal status of the Apache Horses.  This document summarizes the information on the origin of the horses found on the Alpine and Springerville Ranger Districts, Apache-Sitgreaves National Forests.

## Background

Currently there are approximately 300-400 horses located in the Black River region of the Apache National Forest (Figure 1). In 1971, Congress passed the Wild Horse and Burro Act. This Act directed Forests to identify any unclaimed horses or burros located on the lands they manage. Records indicate there were no unclaimed horses on the Apache National Forest at the time the Act was passed.

## Relationship of Apache Horses to Heber Wild Horse Territory

An analysis of travel corridors found it highly unlikely that the present-day Black River Horses (Apache Horses) could be a result of migration from the HWHT due to natural and manmade barriers and dispersal characteristics of horses. Figures 2 and 3 display many of the barriers to dispersal located on the Apache-Sitgreaves National Forests. Similar barriers are present on the Fort Apache Indian Reservation; however, the data was not available to the Forest in the form necessary to create a map. Forest records on the HWHT do not support any assumption that the herd migrated from the Sitgreaves National Forest.

# Apache-Sitgreaves National Forests
## Apache Horse Analysis
### Vicinity Map



*Figure 1: Horse Vicinity Map*



Figure 2: Travel Corridor Barrier Analysis



*Figure 3: Travel Corridor Separation Analysis*

## Forest Service Research on Apache Horses

In early 2020, Forest Service historians conducted a review of range management records for the Sprucedale-Reno and West Fork allotments (Figures 4 and 5) to evaluate the historical presence of unauthorized livestock.[1] Findings from that report include the following:

- Prior to the 1940s, there were no records of unauthorized livestock on these two allotments.
- From the 1940s to 1990s, the occurrences of unauthorized horses were attributed to animals associated with surrounding grazing permits.
- In the 1990s, the occurrence of unauthorized horses in this area increased, with animals originating from the Sprucedale-Reno Allotment and Fort Apache Indian Reservation.
- From the 2000s to present, the unauthorized horses have exponentially increased in this area with a 2018 University of Arizona study[2] estimating a population of 260 animals within the study area.
- No unauthorized horses or other livestock were present on the Forest for any length of time prior to the mid-1990s.
- Close reading of the material indicates no consistent presence of unauthorized livestock and only minimal trespass on the West Fork and Sprucedale-Reno Allotments until the 2000s.
- Before the mid-1990s, most incidents of unauthorized livestock appear to have occurred as a result of fence problems between allotments rather than between allotments and the reservation.

Neighboring allotments have been impacted due to the expansion of the horses.

Based on available information, the historians concluded that there were no free-roaming, unauthorized horses consistently resident on either the Sprucedale-Reno or the West Fork Allotments between the 1940s and the mid-1990s.

## Grazing Allotment Decisions and Black River Conservation Area

The Sprucedale-Reno and West Fork allotments represent the core area where the unauthorized horse issue originated and expanded from. These allotments are located on the Apache Zone and border the Fort Apache Indian Reservation to the west (Figures 4 and 5).

### Sprucedale-Reno Allotment

A NEPA decision signed December 5, 1995 authorized two grazing permits on the Sprucedale-Reno allotment:

- W. Wiltbank – 223 cattle (cow/calf), July 15 to October 31.
- E. Wiltbank – 85 horses and 8 cattle (cow/calf), July 15 to October 31.

---

[1] Kline, R. D. 2020 Apache-Sitgreaves National Forests Unauthorized Livestock History, USDA Forest Service Enterprise Program.

[2] Blum, B., Noelle, S., Nichols, M., Ruyle, G., 2018. Examination of the Ecological Interactions of Free-Roaming Horses on Montane Riparian Systems on the Apache-Sitgreaves National Forest, Arizona, USA. Tucson: University of Arizona School of Natural Resources and the Environment.

This decision also identified a need for the following exclosures:

- Fence Corduroy, Double Cienega and Fish Creeks to create riparian exclosures.
- Fence Reach 3 and a portion of Reach 2 on Conklin Creek and fence Conklin Cienega.

Based on discussions with district range management specialists, the permittees opted to remove some of the pastures associated with these riparian systems from grazing rotation due to challenges with implementing the riparian management identified in the NEPA decision. Cat, Black River and Perry Springs pastures have not had authorized livestock use since 1990.

## West Fork Allotment

The West Fork Allotment has had two NEPA decisions over the last 30 years. The first decision, Revised Allotment Management Plan (West Fork Allotment), was signed on May 14, 1993. It identified:

- Allow 310 head of livestock to graze the allotment annually, for five months (June 1 – October 31), during the initial six-year grazing cycle.
- Exclude livestock grazing from Centerfire Creek in the Middle and North Pastures.
- The construction of a riparian pasture.
- Two riparian exclosures (excludes all grazing use by elk and livestock), each ¼ mile in length (one on Boggy Creek and one on Centerfire Creek).
- The length of critical stream channels along Centerfire, Boggy and Wildcat Creeks will be protected from all grazing (i.e. livestock and elk), will increase from 0 miles to 0.5 miles (10% of all critical reaches).
- Seventy three percent (3.73 miles) of the 5.15 miles of critical stream reaches will be fenced to exclude domestic livestock and 0.5 miles (10%) will be fenced to exclude grazing by elk and livestock.
- Critical riparian habitat along Centerfire and Boggy Creeks will be protected from all grazing (livestock and elk) and will increase from 0 to 12 acres, and the acres protected from livestock grazing will increase from 0 to 81 acres.

The second NEPA decision, West Fork Allotment, Allotment Management Plan Analysis, signed September 27, 2005, supersedes the 1993 decision and includes:

- 129 adult cattle (cow/calf pairs) will be permitted to graze on the West Fork Allotment from July 15 to October 31 each year; this number includes associated bulls.
- Range developments to exclude livestock from the main riparian stream on the allotment include construction of approximately 3.1 miles of new fence (in four segments), relocation of one-tenth mile of fence, and provision of water in one pasture.
- Exclusion of livestock from grazing sensitive or critical areas (West Fork Black River and Home, Boggy, Centerfire and Wildcat Creeks).

The North West, Middle West and South Pastures have been excluded from grazing since 1993.

# Apache-Sitgreaves National Forests
## Range Allotments
## Vicinity Map



*Figure 4: Sprucedale Reno and Westfork Allotments Vicinity Map*

Apache-Sitgreaves National Forests
Apache Horse Analysis
Sprucedale/Reno and Westfork Allotments and Pastures



*Figure 5: Pastures in the Sprucedale Reno and Westfork Allotments*

## Black River Conservation Area

In 2005, the Apache-Sitgreaves National Forests, Arizona Elk Society and livestock permittees entered into a Memorandum of Understanding (MOU) on several grazing allotments to address conflicts with recreation, threatened and endangered fisheries and livestock grazing. This MOU removed pastures in several allotments from livestock grazing, removed interior fences, and realigned boundary fences and their associated maintenance responsibilities. The pastures identified in this MOU were incorporated into the Black River Conservation Area through Forest Plan Revision for the Apache-Sitgreaves National Forests (2015).

Unauthorized horses originated along the Black River on the Sprucedale-Reno and West Fork Allotments along Forest Service Road (FSR) 25 from Buffalo Crossing to Wild Cat Crossing. Removal of portions of grazing allotments from use by these two NEPA decisions and the MOU created a challenge. Portions of the fences surrounding these areas were no longer assigned to a permittee for maintenance and permittees no longer monitored these locations for stray livestock. This allowed for stray livestock to disperse further into the surrounding areas on the Forest.

## Fencing Issues

Many allotments and pasture fences in the Southwest Region were installed in the 1930s and 1940's when forests used the help of the Civilian Conservation Corps to divide large allotments with several permittees into much smaller allotments with few permittees or an individual permittee. Pasture fencing was also installed to assist with grazing rotations. As time has progressed, fences have been added, removed, replaced, and rerouted. Portions of the boundary fence between Fort Apache Indian Reservation and the Apache National Forest were reconstructed in the 1970's.

In the 1990's, when unauthorized horses began to increase, many of these fences were 20-60 years old in varying levels of condition, maintenance and upkeep. During this same time, tribes lost funding to assist in maintenance and reconstruction of fences for shared boundaries. These factors, compounded with the removal of fences from permittee maintenance responsibility, increasing elk numbers, pressure from horses and other livestock, fire, high wind events and falling trees all contributed to the challenge of managing livestock movements with fences. While these challenges exist with most fences, the 1990's appear to be the inflection point in which fencing maintenance exceeded the Forest's capacity largely due to workforce and funding. This is an issue shared across the region and has progressively worsened.

Wildfire has also contributed to fencing problems across the region. The Wallow Fire occurred in 2011 and burned over 500,000 acres, largely on the Apache-Sitgreaves National Forests (Figure 6). Approximately 14 miles of boundary fence between the Forest and Fort Apache Indian Reservation was impacted by the Wallow Fire. A post-fire inspection of this fence line showed varying degrees of fire damage to a fence that was largely in poor condition prior to the Wallow Fire. The 14 miles of damaged fence have since been repaired.

# Apache-Sitgreaves National Forests
## Apache Horse Analysis
### Wallow Fire Scar



*Figure 6: Wallow Fire Scar*

## Factors Potentially Influencing Increase in Unauthorized Horse Population

In June of 2011 the United States Government Accountability Office submitted a report to congress on the unintended consequences from the Cessation of domestic slaughter. The following information is a summary of this report as it pertains to issues of abandonment and neglect.

In 2007, all domestic slaughter of horses ceased in the United States. Since 2007 there has been a reported increase in horse abandonments and an increase in investigations for horse abuse and neglect.[3] State officials attributed the decline in horse welfare to many factors, but primarily to the cessation of domestic slaughter and the U.S. economic downturn.

While the Forest does not have records of individual cases of abandonment, horses often will be abandoned in areas where other horses are present.  Horses with domesticated traits have been observed in the Black River area.

## Other Influencing Factors

A herd of 60-70 Rocky Mountain elk (*Cervus canadensis* subsp. *nelsoni*) were first introduced within the Apache-Sitgreaves National Forests around 1913 following the extirpation of Merriam's elk (*Cervus canadensis* subsp. *merriami*) from the area in 1890s. By the 1990s, Rocky Mountain elk populations were large enough to support an increased opportunity for hunting. While elk-livestock conflicts had existed prior to this time, these conflicts became much more noticeable across the landscape in the 1990's, especially regarding fencing issues.

Additionally, climate in this area has changed. Prior to the early 2000s, this area received substantial snowfall that would force wildlife and horses to lower elevations and off forest lands during the winter months. Warmer temperatures and less snowfall have resulted in stray horses remaining in this area year-round. If the expanding horse population persists, a mass winter kill could be expected if winter precipitation and weather conditions return to historical norms; many animals would likely be trapped without an opportunity to move to lower elevations.

## Summary

When the Wild Horse and Burro Act was passed by Congress in 1971, there were no free-roaming horses documented on the Apache National Forest and no territory was established. While horses were found on the Sitgreaves National Forest, resulting in the establishment of the Heber Wild Horse Territory, the horses now found on the Apache National Forest are not connected to the Heber horses.  In the mid-1990's, instances of unauthorized horses from the Sprucedale-Reno Allotment began to increase. In the mid-2000's, the issues of unauthorized livestock from the Sprucedale-Reno Allotment and neighboring Fort Apache Indian Reservation became more prevalent and the number of unauthorized horses exponentially increased with time

---

[3] GAO 2011. Horse Welfare Action Needed to Address Unintended Consequences from Cessation of Domestic Slaughter, Report to Congressional Committees.

While not detailed above as it is outside the scope of this assessment, there are indications that the Apache horses are causing detrimental environmental impacts on the Apache National Forest. This includes direct effects to habitats of federally listed species including the New Mexico meadow jumping mouse, Chiricahua leopard frog, narrow-headed gartersnake, loach minnow and Apache trout, and indirect effects to habitats of Three Forks springsnail and Mexican spotted owl. Other environmental impacts include reduction in forage for wildlife and authorized livestock, and challenges in managing critical watersheds.

## Appendix A: Code of Federal Regulations

36 CFR 222.8 (a) (1) and (3): Cooperation in control of estray or unbranded livestock, animal diseases, noxious farm weeds, and use of pesticides.

(a) Insofar as it involves National Forest System lands and other lands under Forest Service control or the livestock which graze thereupon, the Chief, Forest Service, will cooperate with:

(1) State, county, and Federal agencies in the application and enforcement of all laws and regulations relating to livestock diseases, sanitation and noxious farm weeds.

(3) State cattle and sheep sanitary or brand boards in control of estray and unbranded livestock to the extent it does not conflict with the Wild Free-Roaming Horse and Burro Act of December 15, 1971.

36 CFR 261.7 (a) and (b)

The following are prohibited:

(a) Placing or allowing unauthorized livestock to enter or be in the National Forest System or other lands under Forest Service control.

(b) Not removing unauthorized livestock from the National Forest System or other lands under Forest Service control when requested by a forest officer.

36 CFR 262.10: Impoundment and disposal of unauthorized livestock.

Unauthorized livestock or livestock in excess of those authorized by a grazing permit on the National Forest System, which are not removed therefrom within the periods prescribed by this regulation, may be impounded and disposed of by a forest officer as provided herein.

(a) When a Forest officer determines that such livestock use is occurring, has definite knowledge of the kind of livestock, and knows the name and address of the owners, such livestock may be impounded any time five days after written notice of intent to impound such livestock is mailed by certified or registered mail or personally delivered to such owners.

(b) When a Forest officer determines that such livestock use is occurring, but does not have complete knowledge of the kind of livestock, or if the name of the owner is unknown, such livestock may be impounded any time 15 days after the date a notice of intent to impound livestock is first published in a local newspaper and posted at the county courthouse and in one or more local post offices. The notice will identify the area in which it will be effective.

(c) Unauthorized livestock or livestock in excess of those authorized by a grazing permit on National Forest System which are owned by persons given notice under paragraph (a) of this section, and any such livestock in areas for which a notice has been posted and published under paragraph (b) of this section, may be impounded without further notice any time within the 12-month period immediately following the effective date of the notice or notices given under paragraphs (a) and (b) of this section.

(d) Following the impoundment of livestock, a notice of sale of impounded livestock will be published in a local newspaper and posted at the county courthouse and in one or more local post

offices. The notice will describe the livestock and specify the date, time, and place of the sale. The date shall be at least five days after the publication and posting of such notice.

(e) The owner may redeem the livestock any time before the date and time set for the sale by submitting proof of ownership and paying for all expenses incurred by the United States in gathering, impounding, and feeding or pasturing the livestock. However, when the impoundment costs exceed fair market value a minimum acceptable redemption price at fair market value may be established for each head of livestock.

(f) If the livestock are not redeemed on or before the date and time fixed for their sale, they shall be sold at public sale to the highest bidder, providing this bid is at or above the minimum amount set by the Forest Service. If a bid at or above the minimum amount is not received, the livestock may be sold at private sale at or above the minimum amount, reoffered at public sale, condemned and destroyed, or otherwise disposed of. When livestock are sold pursuant to this regulation, the forest officer making the sale shall furnish the purchaser a bill or other written instrument evidencing the sale. Agreements may be made with State agencies whereby livestock of unknown ownership and livestock of known ownership, which are not redeemed by the owner, are released to the agency for disposal in accordance with State law, Provided, That remuneration of proceeds from the sale of said animals in excess of costs of impoundment and to arrange for disposal of livestock of known ownership will be refunded to the former owner.

36 CFR 220.6 Categorical exclusions (d) (1)

(a) General. A proposed action may be categorically excluded from further analysis and documentation in an EIS or EA only if there are no extraordinary circumstances related to the proposed action and if:

(1) The proposed action is within one of the categories established by the Secretary at 7 CFR part 1b.3; or

(2) The proposed action is within a category listed in § 220.6(d) and (e).

(d) Categories of actions for which a project or case file and decision memo are not required. A supporting record and a decision memo are not required, but at the discretion of the responsible official, may be prepared for the following categories:

(1) Orders issued pursuant to 36 CFR part 261—Prohibitions to provide shortterm resource protection or to protect public health and safety.

## Appendix B: Definitions

**Unauthorized Livestock:** Unauthorized livestock means any cattle, sheep, goat, hog, or equine not defined as a wild free-roaming horse or burro by § 222.20(b)(13), which is not authorized by permit to be upon the land on which the livestock is located and which is not related to use authorized by a grazing permit; provided, that noncommercial pack and saddle stock used by recreationists, travelers, other Forest visitors for occasional trips, as well as livestock to be trailed over an established driveway when there is no overnight stop on Forest Service administered land do not fall under this definition. 36 CFR 261.2

**Wild Horses:** Wild free-roaming horses and burros mean all unbranded and unclaimed horses and burros and their progeny that have used lands of the National Forest System on or after December 15, 1971, or do hereafter use these lands as all or part of their habitat, but does not include any horse or burro introduced onto the National Forest System on or after December 15, 1971, by accident, negligence, or willful disregard of private ownership. Unbranded, claimed horses and burros for which the claim is found to be erroneous, are also considered as wild and free-roaming if they meet the criteria above. 36 CFR 222.60 (b) (13)

**Stray:** "Stray animal" as used in this article means livestock, bison or ratites whose owner is unknown or cannot be located, or any such animal whose owner is known but permits the animal to roam at large on the streets, alleys, roads, range or premises of another without permission, except that this section does not apply to livestock where the principles of a federal permit, federal allotment or federal lease are in dispute. 3-1401. Definition of stray animal

## Appendix C: References

Arizona State Legislature, March 10, 2021 Arizona Revised Statutes Title 3 – Agriculture, https://www.azleg.gov/arsDetail/?title=3

Blum, B., Noelle, S., Nichols, M., Ruyle, G., 2018. Examination of the Ecological Interactions of Free-Roaming Horses on Montane Riparian Systems on the Apache-Sitgreaves National Forest, Arizona, USA. Tuscon: University of Arizona School of Natural Resources and the Environment

GAO, 2011 Horse Welfare Action Needed to Address Unintended Consequences from Cessation of Domestic Slaughter, Report to Congressional Committees.

Kline, R. D., Quarles, L. D., 2021 Unauthorized Livestock History, USDA Forest Service Enterprise Program.

Records of the Apache-Sitgreaves National Forests.

U.S. Government, July 1, 2020 Code of Federal Regulations, Title 36, Parks, Forests, and Property, Parts 200 to 299, U.S. Government Publishing Office

# Exhibit "E"

1



| | United States Department of Agriculture | Forest Service | Apache-Sitgreaves National Forests | 30 South Chiricahua Drive SpringervilleAZ85938 |

**Date:** December 15, 2021

This memo documents my decision to use the Categorical Exclusion (CE) 7 CFR 1b.3(5) *Civil and Criminal law enforcement and investigative activities* to authorize the removal of unauthorized livestock from the Apache National Forest.

I am also authorizing the use of Categorical Exclusion 36 CFR 220.6(d)(1) Orders issued pursuant 36 CFR part 261 *Prohibitions to provide short-term resource protection or to protect public health and safety* to issue closure orders around trap sites used to remove the unauthorized livestock, as needed.

Neither of these categories require a Decision Memo or a Project Record. However, a project record was created to document public scoping efforts, rationale as to why these CE categories fit the proposed action, and why there are no extraordinary circumstances related to the proposed action.

In accordance with 36 CFR 261.7 Livestock:
The following are prohibited:
   (a) Placing or allowing unauthorized livestock to enter or be in the National Forest System or other lands under Forest Service control
   (b) Not removing unauthorized livestock from the National Forest System or other lands under Forest Service control when requested by a forest officer.

Guidance in 36 CFR 262.10 Impoundment and disposal of unauthorized livestock states: Unauthorized livestock or livestock in excess of those authorized by a grazing permit on the National Forest System, which are not removed therefrom within the periods prescribed by this regulation, may be impounded and disposed of by a forest officer as provided herein.

   (a) When a Forest officer determines that such livestock use is occurring but does not have complete knowledge of the kind of livestock, or if the name of the owner is unknown, such livestock may be impounded any time 15 days after the date a notice of intent to impound livestock is first published in a local newspaper and posted at the county courthouse and in one or more local post offices. The notice will identify the area in which it will be effective.
   (d) Following the impoundment of livestock, a notice of sale of impounded livestock will be published in a local newspaper and posted at the county courthouse and in one or more local post offices. The notice will describe the livestock and specify the date, time, and place of the sale. The date shall be at least five days after the publication and posting of such notice.

(e) The owner may redeem the livestock any time before the date and time set for the sale by submitting proof of ownership and paying for all expenses incurred by the United States in gathering, impounding, and feeding or pasturing the livestock. However, when the impoundment costs exceed fair market value a minimum acceptable redemption price at fair market value may be established for each head of livestock.

(f) If the livestock are not redeemed on or before the date and time fixed for their sale, they shall be sold at public sale to the highest bidder, providing this bid is at or above the minimum amount set by the Forest Service. If a bid at or above the minimum amount is not received, the livestock may be sold at private sale at or above the minimum amount, reoffered at public sale, condemned and destroyed, or otherwise disposed of. When livestock are sold pursuant to this regulation, the forest officer making the sale shall furnish the purchaser a bill or other written instrument evidencing the sale. Agreements may be made with State agencies whereby livestock of unknown ownership and livestock of known ownership, which are not redeemed by the owner, are released to the agency for disposal in accordance with State law, *Provided,* that remuneration of proceeds from the sale of said animals in excess of costs of impoundment and to arrange for disposal of livestock of known ownership will be refunded to the former owner.

An impound notice will run in the White Mountain Independent Newspaper based out of Show Low, AZ on December 21, 2021. This notice will also be posted at the Apache County and Greenlee County Courthouses; and the Alpine, Eagar, and Springerville Post Offices.

I have looked at the documentation in the project record and considered the issues and comments brought forward during scoping. After considering this information, I have decided to implement the Unauthorized Livestock project.

Sincerely,

Judy Palmer
Forest Supervisor
Apache-Sitgreaves National Forests

# Exhibit "F"

**To claim livestock impounded from National Forest System land:**

Before the owner will be permitted to redeem and regain possession of the unauthorized livestock, the owner must show proof of ownership and pay the Forest Service the expense incurred in the impounding, feeding, and care of the livestock. Further information in regard to the redemption of impounded livestock may be obtained from the Apache-Sitgreaves National Forests in Springerville, AZ through the Rangeland Program Manager at 928-333-6309.

**Sale Information (information updated at 0658hrs, July 8th 2022)**

- **When:** 10am on July 14th, 20th & 21st
- **Where:** Navajo County Fairgrounds,
  404 E. Hopi Drive, Holbrook AZ
- **Who:** Public buyers with valid ID and means to transport
- **What:** Public sale of any unclaimed, impounded livestock

## News Releases

- USDA Forest Service to Conduct Necessary Removal of Unauthorized Livestock - Feral Horses

## Documents

- Determination Letter Madrid
- Letter to the File Palmer
- Assessment of Feral Horses
- Stipulated Settlement re: Boundary Fence Reconstruction, Unauthorized Livestock, NM Meadow Jumping Mouse
- Court Order, Case Dismissal re: Stipulated Settlement on Boundary Fence Reconstruction, Unauthorized Livestock,